The verdict was authorized by the evidence. The special grounds of the motion for new trial are without merit.
Judgment affirmed. All the Justicesconcur.
 No. 15419. APRIL 2, 1946.
 STATEMENT OF FACTS BY DUCKWORTH, JUSTICE.
Frank Hunter was tried in the Superior Court of Fulton County under an indictment charging him with the murder of his wife, Gertrude Hunter. There was evidence substantially as follows: The accused and his wife, the deceased, drove to the filling station of H. T. Harris at the corner of Georgia Avenue and Washington Street in the City of Atlanta, Fulton County, Georgia, between 1 and 2 o'clock on the afternoon of April 25, 1945. Hunter got out of the car, went into the filling-station office, and removed from the drawer of a cabinet a .45 caliber army pistol which was then in pawn with Harris. This pistol was introduced in evidence as the State's exhibit No. 5. After getting the pistol he returned to his car and was driven away by his wife. The time spent at the filling station was about fifteen minutes. They returned to the filling station in about forty-five minutes, the car being driven at that time by the accused. After they had remained in the car for about ten minutes a shot rang out, the deceased screamed, the accused momentarily took her in his arms, then released her, and immediately drove away without saying anything or asking any assistance from those who were at the filling station. No one saw or heard any disturbance before the firing of the shot. When the accused drove the car to the filling station the second *Page 575 
time, his wife was on the front seat with him and was sitting sideways and facing him. The evidence was in conflict as to what actually happened immediately before the shooting, one witness testifying that the deceased and the accused were scuffling down around the dashboard of the car, and another witness testified that the deceased was sitting sideways with one arm in the window, and that when the shot was fired, she threw up both of her hands and screamed. Another witness testified that the car was slowly driven by the accused into the filling-station yard, and it was otherwise testified that the car came in quickly and was suddenly stopped.
Robert Coursey testified that he worked at the filling station and was present when the shooting occurred. He had known the accused for approximately six months to a year, and saw him at the filling station nearly every day. He did not hear any statement from either the accused or the deceased before the shooting. The accused had been to the filling station earlier in the day, and later, about 1 o'clock, returned. A drawer was left open in the cabinet or desk and the pistol was gone. He later asked the accused for the pistol and was told that he did not have it. He told the accused that the proprietor was going to get all over him about breaking into the desk, and the accused denied that he had done so. The witness heard the shot and heard the deceased scream. He saw the smoke coming out of the gun where she was slumping over. He ran inside the station. He did not go to his friend, the accused, because he was scared.
There was conflicting evidence as to whether or not the domestic relations between the accused and the deceased were harmonious. The mother of the deceased testified that her daughter had been separated from the accused at one time. They had been married about six years and had lived in Athens, Georgia, but in 1945 moved to Atlanta, and at the time of the death of the wife were living in one side of a duplex. The mother testified that she had seen her daughter on several occasions with black eyes, and had complained to the accused about it and was promised by him that he would not strike her again. On the morning of the day that the deceased met her death, the accused had requested that she "see the man about putting in for her divorce," and she replied that there was a death in the family and she would take care of that later. The accused said he wanted her to hurry up and get it *Page 576 
done because he was going to New York. The deceased's mother had been to their living quarters only twice. There she saw a bedroom suite, chairs, and a dining-room suite.
Mrs. Sam Azar testified that she occupied one side of the duplex in which the accused and the deceased had been domiciled since about March 1, 1945. She knew that the deceased went to her mother's home the night before the homicide, but did not know the reason. She saw the accused and the deceased daily, and never saw the deceased with a black eye or bruises. She did not know either of them before March 1, 1945, and knew nothing of their relations prior to the time they moved in one side of the duplex.
Mrs. B. B. Daniel testified that on the morning of the day of the homicide she was present at the home of her sister, Mrs. William T. Addison, the mother of the deceased. The deceased was present when the witness arrived, and later the accused came to the home. The accused stated that he wanted a white piece of paper that he claimed he had given the deceased to put away for him, but which she said she did not remember receiving from him. She poured out the contents of her pocketbook, but the paper was not among them. About this time the deceased missed her watch which she said had been on the radio. The accused had walked over to the radio. She asked if he had the watch, and he said, "No." Later he said he would give her the watch if she would sign the paper, and she said, "When I get my watch." He asked her when she was going to get the rest of her clothes, some of her clothes having been removed from their apartment to the home of her mother, and he said he wished she would hurry up about it and then left.
Mrs. William T. Addison, mother of the deceased, who was present on the occasion of the above-mentioned incident, substantially corroborated the testimony of the witness, Mrs. B. B. Daniel, saying that her daughter told the accused that she was not going to sign for any gas. Later the witness was at her mother's home, and the deceased and the accused drove up in front of the house and he called her out and asked her to tell the deceased to give him the paper, and she told him that she could not tell her to give him something she did not have and he had gone through her pocketbook. She testified that the accused was drinking, she could smell whisky, and cautioned him about it. The car, with the deceased driving, then went towards town. *Page 577 
Mrs. J. A. Estes testified that on the date of the homicide her sisters, Mrs. B. B. Daniel, Mrs. William T. Addison, and Mrs. Black, together with the deceased, came to her home at 914 Hollywood Road. They were making preparations to bury their dead sister when the accused drove up in front of the house and asked for "Mrs. Day," which is Mrs. Addison's name, and was told that she was not there but that the deceased was present. The deceased went to the car. The witness saw a bottle lying in the seat beside the accused. This bottle was identified and introduced in evidence as the State's exhibit No. 6. The accused was using foul language, and the witness told him she did not appreciate his coming there and talking that way while her sister was lying in a casket. At that time the deceased was standing by the car. The witness heard the accused say, "You coming? If you ain't I will come after you." The deceased said, "Wait, let me get my pocket-book." She went back in the house, and when she came out she was crying and said that there was a piece of paper the accused had to have before he could get gas. The witness told the accused that the deceased was afraid to ride with him, whereupon he moved over and she got in the car and drove off about 12 o'clock or later.
W. C. Dorsey, ambulance driver for Grady Hospital, testified that on the day of the homicide he saw the body of Mrs. Hunter. He identified pictures of her, State's exhibits Nos. 1, 2, 3, and 4. She was slumped over in the front seat of the car in the ambulance drive of Grady Hospital about 3:30 or 4 o'clock. He saw in the car a bottle with whisky in it (State's exhibit No. 6), and saw the .45 army pistol when one of the other employees picked it off of the running-board on the same side of the car where the liquor was picked from. Cartridges were in the gun. As far as he knew the deceased was dead when the witness saw her. She was not under the steering wheel.
Dr. George Ricketson testified that he examined the body of the deceased at about 3 o'clock, and that exhibits Nos. 1, 2, 3, and 4 were correct pictures of the body represented to him as that of Mrs. Hunter. When he examined the body, she was dead. The body showed evidence of having been shot with a gun, the point of entrance being in the chest wall and a little above the heart and to the left, the point of exit being on the right shoulder blade. In his opinion the wounds he found on the body could have been *Page 578 
caused by a pistol exhibited to him, State's exhibit No. 5. She had been injured only a short while before he made his examination, and in his opinion the death of the woman was caused by the pistol bullet when it penetrated her chest. He made no effort to probe the wound or trace the bullet. He saw the point of entrance and the point of exit, and knew without any examination about the path the bullet took, and had every reason to believe that this was what produced death, the bullet ranging down and to the right and backward, the point of entrance being higher on the body than the point of exit, an inch or an inch and a half.
J. E. Helms testified that he talked with the accused about the death of his wife and was told that the gun went off accidentally while they were scuffling with it. The accused later told him that the deceased had the gun, unloading it, and he grabbed for it and it went off. He then told the witness that it was in his hand and he didn't care what was done to him. The statement was made at about 3:30 o'clock at Grady Hospital, and the accused had been told that his wife was dead. The accused said that he bought the pistol from a fellow at the corner of Georgia Avenue and Washington Street for $60. The stranger had left the gun at Mr. Harris' filling station for sale, and the accused bought it from the stranger.
Mrs. Eula Ray, mother of the defendant, testified that on April 25, 1945, she and her eleven-year-old daughter occupied one of the rooms of the defendant's home. She never saw the deceased with black eyes, bruises, or other injuries on her body, and never saw the defendant strike his wife.
L. F. Preston, an employee of Grady Hospital, testified that he was present when the body of the deceased was brought there and he saw it. He asked the defendant how it happened and he said she did it herself.
The defendant made a statement substantially as follows: He was not guilty because he could not harm his wife as he loved her too much. On the day she went to her mother's, she went there because he was going out of town and she went there to spend the week. He went to the ration board to see about a book for the car he had bought for her, and was told that she would have to fill out an application to put the book in her name. He went to her mother's to get her to fill out the paper. She *Page 579 
said she did not have it in her pocketbook. He told her he would come out that afternoon if he could find the paper. The ration board gave him a little yellow slip to be filled out if he could not find the white slip, and to put in a claim to transfer the book. He could not read and write, and his wife had to do that for him, and that is why he went out there. They came back to town and went to the service station and she was driving, and then they went to her aunt's house. She said, "Let me go and get my pocketbook." She went in the house and got her purse and returned and got in the car and she drove. They went to her mother's, and he asked the mother if she needed a car for the funeral, and she replied that one was coming from the funeral people. They left there and the deceased drove the car. He told her to go by the service station, as he wanted to get a gun because he was going on a trip, and by himself he always carried a gun with him. He got out of the car at the filling station, got the pistol, returned to the car, and laid the gun on the front seat. They drove out towards Grant's Park. They were just riding around, and he told her to go back to the filling station, that he wanted to see Mr. Harris, the proprietor, before he went out of town. They went there and stopped a few minutes. His wife reached down and picked up the pistol. He told her it was loaded and went to take it out of her hands and the gun fired, and he rushed her to the hospital. When they got there, the doctor came out and told him that his wife was dead. He knew then that he had lost the best friend he had in the world and the only one he loved. He was not guilty. He loved her so much he gave her dresses, bought her that automobile to be happy, and they were happy together. They never had any fights, had little arguments, but never had a fight. They had a little argument when she wanted to go to New York and he told her she could not go. It was too long a trip for her because he would be up night and day driving, and she said she was going to her mother's and spend the week-end. That is the reason he could not kill his wife, because he loved her so much, and was not guilty.
The jury returned a verdict of guilty with a recommendation of mercy, and the defendant was sentenced to life imprisonment. The defendant filed a motion for a new trial on the usual general grounds and by amendment added several special grounds. *Page 580 
Special ground 1 complains that the court erred in refusing to permit the mother of the defendant to answer the following question: "Did Gertrude [the deceased] ever tell you or Frank [the defendant] tell you that she usually filled out all of his papers for him?" It was stated to the court that the purpose of the question was to show that the defendant could not read or write, and that the purpose in looking for a certain paper, as referred to in the statement of facts, was to get his wife to fill out an application for gasoline for the car which he stated he had bought for her. It is contended that, against the State's position that the defendant killed his wife through malice because she would not give him the paper, this testimony was relevant and material on the question of motive and state of mind of the defendant.
Special ground 2 complains that the court erred in ruling out as irrelevant and immaterial the following questions, propounded to the proprietor of the filling station where the wife met her death. and the answer as made by him: "Q. Did he [the defendant] trade with you there at that place? A. One of my best customers. Q. Did you know, Mr. Harris, that Frank sometimes made trips as far as New York? Q. Did he ever ask you to loan him the pistol on any of these trips?" It is contended that the questions and answers sought were material and relevant on the question of conduct and motive of the defendant, and that the answers would tend to show that his possession of the pistol was for peaceful purposes and not, as contended by the State, to provide himself with a deadly weapon with which to murder his wife, and the action of the court further abridged the right of the defendant to show that the killing was not intentionally done.
Special ground 3 complains as to the admission of certain testimony by one of the witnesses, to the effect that the reason he did not go to his friend, the defendant, when he heard the pistol fire at the filling station was that he was scared, it being contended that it was prejudicial, irrelevant, and immaterial and tended to create in the minds of the jury the idea that the defendant was such a bad man that even a close friend would be frightened or scared in the event a shot was fired.
Special ground 4 complains that the court erred in not granting a mistrial, on motion of counsel for the defendant, because of the following conduct on the part of the solicitor-general. The question *Page 581 
was asked a witness: "You talked to the police officers who were investigating this murder, didn't you?" The witness answered, "Yes." Counsel for the defendant interrupted the examination and asked for a mistrial because the language was highly prejudicial and inflammatory. The court overruled the motion and cautioned the solicitor-general to be more moderate in his tone in addressing the witness. The solicitor-general then stated: "I asked this witness if he was interviewed by the police officer immediately after or if the police officer interviewed him about this murder charge, and before I could say `murder charge,' Mr. Hudson jumped up and just started talking." The motion for mistrial was then renewed and the court adhered to its ruling. It is contended that the question was the same thing as the solicitor-general, a quasi judicial officer, calling the defendant a murderer before the jury and during the progress of the trial, and that it was so prejudicial and harmful that a new trial should be granted.
Special ground 5 complains that the court erred in excluding from the evidence a batch of invoices for the purchase of various pieces of furniture during a portion of 1943, 1944, and 1945, all invoices showing that they were paid, and the purchases being for the defendant's wife, each invoice showing the name of Frank Hunter or Mrs. Hunter, containing a description of the article purchased, the date, and the amount and date of payment; also a batch of receipts showing payment of various sums of money to Sterchi Brothers in Athens and in Atlanta, Georgia, the invoices showing the purchase of, and the receipts the amount of, approximately $1000 worth of jewelry and furniture. It is contended now, and was contended then, that the sole defense of the defendant was that the homicide was an accident; and that the fact that over a period of approximately eighteen months the defendant was regularly and consistently buying jewelry and furniture nearly every month, and up to the time when he gave his wife an automobile a few days before the homicide, showed or tended to show that his feelings towards her were kindly and demonstrated love and affection for her, and had a tendency to negative malice, motive, and intent to kill; and for these reasons it was error to rule out the evidence, since the State had introduced evidence indicating *Page 582 
that the accused and the deceased were separated or about to separate.
The court overruled the motion for new trial, and the exception here is to that judgment.